HARRIGAN & REID CO. v. HUDSON.

1. PRINCIPAL AND AGENT—ARCHITECTS—PAYMENT TO SERVICE AND MATERIALMEN.

Architect, employed by defendant owners under contract to obtain bids, draw up contracts, supervise entire work and general architectural services in the construction of a house, did not thereby gain authority to bind defendants to a contract to pay anything to plaintiff who furnished plumbing and heating material and services.

2. SAME—AUTHORITY TO CONTRACT—EVIDENCE.

Authority of one person to contract for another cannot be proved by admissions or statements of the alleged agent whose authority must be determined from or by acts of his principal and not by agent's representations or doings.

3. WORK AND LABOR—CONSTRUCTION OF BUILDING—CONTRACTS—EVIDENCE—AUTHORITY OF AGENT.

In action by corporation engaged in plumbing and heating business against owners of house for which plaintiff furnished materials and performed services, evidence *held,* to require finding that there was never any expressed or implied contract between plaintiff and defendants where plaintiff at time of seeing specifications knew, or should have known, that the house was to be erected under a general contract under which the owners assumed no liability for claims of subcontractors, payments were made by a general contractor, plaintiff waived mechanic's lien to such contractor in order to secure final payment, had known a general contractor was to be in charge of the work shortly after commencing and was desirous of knowing who it was to be and had received a written order from the general contractor to furnish certain materials and services, and defendants never saw or spoke to any representative of plaintiff, and their architect with whom plaintiff conducted some negotiations is not shown to have had authority to bind defendants on a contract with plaintiff.

4. PRINCIPAL AND AGENT—ARCHITECTS—SUBCONTRACTORS—GENERAL CONTRACT FOR CONSTRUCTION—LIABILITY OF OWNER.

Architect's agreement to correct his failure to change specifications sufficiently to correspond with plaintiff subcontractor's reduced and revised bid for furnishing plumbing and heating materials and services was not ratified by defendants' acceptance of house from general contractor where there was no agency on part of architect to bind defendants and their only agreement was set forth in the general contract pursuant to which the house was erected.

Appeal from Wayne; Brennan (John V.), J., presiding. Submitted October 12, 1939. (Docket No. 133, Calendar No. 40,780.) Decided December 19, 1939.

Assumpsit by Harrigan & Reid Company, a Michigan corporation, against Julia Buhl Hudson and J. Stewart Hudson for balance due for labor and materials. Verdict for plaintiff. Judgment for defendants *non obstante veredicto*. Plaintiff appeals. Affirmed.

*Charles E. Duffy,* for plaintiff.

*Wurzer & Higgins* (*Robert E. Sweeney* and *John R. Starrs,* of counsel), for defendants.

McALLISTER, J.  Plaintiff, a corporation engaged in the plumbing and heating business, sued defendants, husband and wife, for balance claimed to be due for services and materials furnished in the construction of a house. On trial before a jury, it received a verdict for $1,009. On motion, the trial court entered a judgment *non obstante veredicto* in favor of defendants, and plaintiff appeals.

In August, 1936, defendant owners, planning the building of a home, employed Keyes as architect. The terms of such employment are in writing and provided that Keyes was to perform the following services:

1. Proceed with the completion of the working drawings for a residence.
2. Obtain bids.
3. Draw up contracts.
4. Supervise the entire work, including all necessary full-size drawings.
5. In general, render complete architectural services.

The above constituted the only agreement of any nature between Keyes and the defendants.

About the first part of January, 1937, Edward M. Harrigan, president of the plaintiff company, heard

that defendants were planning to build a home and, after calling upon Keyes, the architect, examining the specifications for the house and discussing the matter with him, sent a letter to Keyes, stating that the plaintiff company was pleased "to make the following estimate for furnishing labor and material necessary to install plumbing, heating, and ventilating and cooling apparatus" for the sum of $38,126. Later, on February 3d, plaintiff sent another estimate to Keyes with regard to certain deductions and additions to the specifications, as a result of bulletins sent out by Keyes. In this further estimate, plaintiff concluded with the statement that there were certain items necessary to check "before giving you an absolute price."

On February 1, 1937, Talbot & Meier, Inc., general contractors, started work on the residence, and on February 3d plaintiff began preliminary work pursuant to a verbal order. Up to this time, it appears that there was no written contract with the general contractor and no written contracts between plaintiff and defendants, or the architect.

On February 10th, however, a contract was signed and executed between the general contractor and defendants.

When Harrigan first met the architect, he examined certain of the specifications for mechanical trades. These specifications referred to the specifications for the architectural trades, providing that the specifications should be subject to the requirements of the standard form and general conditions of the "contract for the construction of buildings (4th Ed.), copyrighted, 1925, by the American Institute of Architects." Such general conditions provided that the contractor should furnish all of the materials and perform all of the work described in the specifications; that the owner would pay the con-

tractor for the architectural trades, plumbing, heating, ventilating, and electrical wiring; that nothing contained in the contract should create any contractual relation between any subcontractor and owner; that subcontractors agreed to be bound to the contractor by the terms of the agreement and to assume all obligations that he assumed toward the owner. It also provided that "nothing in this article shall create any obligation on the part of the owner to pay to, or see to the payment of any sums to any contractor." The specifications further provided that all contracts made by the contractors would be covered by the terms and conditions of the general contract, and that the general contractor would assume full responsibility for the proper execution of the entire work required to make a complete job. Harrigan testified that his bid was submitted *in accordance with the "general conditions" of such form contract.*

Although mention is made therein of a general contractor, Harrigan claims that he did not concern himself about such provision; and stated that when the estimates, referred to by him as "bids," were submitted, he did not know who the general contractor was to be, and had no means of knowing that the work was to be done under a general contract.

On February 3d, after plaintiff's estimate of $29,226 had been sent to the architect, and at the same time that a further estimate on deductions or additions was submitted by plaintiff, the situation, according to Harrigan's testimony, was described in the following way: "At that time I hadn't yet arrived at the final figures. We started working, if my memory serves me, February 3d. * * * Very shortly after the 4th of February I found out about a general contractor." He further testified: "I didn't know until we had started the work, when we were

told it was going to be handled by a general contractor, and I wanted to know who the general contractor was, because I wasn't taking chances with that amount of money with every general contractor.''

A month after Harrigan found out that Talbot & Meier, Inc., was general contractor, he received an order, addressed to plaintiff company, directing delivery of material to the defendant's premises with directions requiring the work to be done in such a manner that it would avoid delay and setting forth the agreed price of the plumbing and heating at the sum of $28,217. This order was signed: ''Talbot & Meier, Inc., purchaser.''

On receipt of this order, Harrigan went to see the general contractor and called attention to the fact that the sum set forth as the agreed price in the order was less than the revised estimate furnished by him to the architect.

What actually happened was that subsequent to receiving revised estimates from Harrigan, the architect did not change the specifications sufficiently to correspond with plaintiff's reduced bid, and that when plaintiff commenced the work, its bid on such reduced specifications was made the contract price, although the specifications required more materials and service than were comprised in plaintiff's altered estimate. The terms of the general contract included the reduced price of plaintiff's bid but not the reduced amount of materials and service.

Harrigan discussed the matter with the architect and claims that he was told that they did not want to take it up at that time with the owners, and that it would be straightened out. About six weeks later plaintiff sent a detailed letter to the general contractor with reference to its claim. Nothing, however, was done about correcting the claimed mistake, and plaintiff continued for several months thereafter

and supplied the requested materials and labor until its part of the work was completed. All during this period plaintiff was paid from time to time by the checks of the general contractor, and finally, just before the last payment, upon request of the general contractor, executed a waiver of rights of mechanic's lien in order to secure the remainder of the money due according to the amount set forth in the general contract.

Plaintiff contends that defendants owe the balance claimed for the reason that the architect, Keyes, was the agent of the defendants; that he had authority to contract for defendants; and that he entered into an agreement to pay plaintiff the amount claimed. Plaintiff further claims that defendants ratified the agreement by acceptance of the house when completed.

There is no evidence that Keyes was an agent for defendants with authority to enter into a contract on their behalf with plaintiff. He was an architect, and the terms of his employment by defendants were explicitly stated to be for the purpose of obtaining bids, drawing up contracts, supervising the work, and rendering general architectural service. By none of these terms would he have any authority to bind defendants to a contract to pay plaintiff any sum whatever. Authority of one person to contract for another cannot be proved by admissions or statements of the alleged agent whose authority must be determined from or by acts of his principal and not by his representations or doings. *Ward* v. *Dunnebecke,* 184 Mich. 703.

There was never any expressed or implied contract between plaintiff and defendants. When plaintiff started work on the project, it had not at that time even agreed with the architect as to the final figures of the work to be done by plaintiff company.

When Harrigan first met Keyes and saw the specifications, he knew, or should have known, that the house was to be erected under a general contract and that the owner assumed no liability for any claims of subcontractors. These provisions were all in the specifications and the form contract to which the specifications referred. If Harrigan read the specifications, he saw that they referred to a general contract and that the terms in such form contract controlled the specifications. The contention of plaintiff's counsel that Harrigan was contracting directly with the owner, or his agent, is untenable. Harrigan himself testified: "I didn't contract with the general contractor. I refused the contract. * * * I did not, and have not had any contract on this job, although we performed the work." All of the payments to plaintiff were made by the checks of the general contractor. Plaintiff claims that the general contractor was only a paymaster for making payment from defendants to him; but that plaintiff executed its waiver of mechanic's lien to such contractor in order to secure the final payment. It would not have been necessary for plaintiff to do this if it were dealing directly with defendants or their agent and if it had relied upon a contract on their part to pay plaintiff.

Harrigan's further statement, that shortly after he commenced work, when told the job was to be handled by a general contractor, he wanted to know who the general contractor was because he "wasn't taking chances with that amount of money with every contractor," can be explained in no other way than that he was relying upon the general contractor rather than upon the owner.

Defendants never saw or spoke to Harrigan or any representative of the plaintiff company. They had a contract with the general contractor to build the

house for a certain amount; they paid this amount on completion of the house according to contract price and specifications. There was no agency on the part of the architect to bind them; their only agreement was that set forth in the general contract. Their acceptance of the house from the general contractor in accordance with the terms of such contract is no ratification of any unauthorized acts of the architect.

The trial court properly entered judgment *non obstante veredicto.*

Judgment affirmed, with costs to defendants.

BUTZEL, C. J., and WIEST, BUSHNELL, SHARPE, POTTER, CHANDLER, and NORTH, JJ., concurred.